We have four arguments this morning, of which the first is case number 22-2185, AMS v. Renesas. We agree with the court. In the first appeal, this court rejected an award of $77 million as unsupported on the law and the facts, and recognized that upwards of 90% of InterCell sales that were included in that award would likely need to be excluded. Yet after a new trial on damages, InterCell still requests almost the entirety of what it was previously denied, now asking for an award of $63 million. For multiple independent reasons, including many that this court already decided in the first appeal, the law and the facts still foreclose such an award. Unless the court has a different preference, I'd like to start with the trade secret issues on proper accessibility and the Head Start. So can I ask, suppose the following, as you know, a lot of different issues in play, and part of the task is to figure out how they relate to each other and what would need to be done on remand, if anything. So suppose we agreed with you that the, I guess, the starting date for the Head Start period was January or February of 2005, not January of 2006. And just on that, is it going to matter if we're not precise about the date? Or is there going to be a giant, costly fight if we don't specify a date, and if we can specify a date, what date should we say? Yeah, let me take that in parts. I think in the blue brief, we said that if the court adopted a date of February 2005... That's not a date, that's a whole month. Sorry. The amount of us grappling about things, we'd like to reduce that. I think our position was you could take it as February 28th of 2005. We said in the blue brief that if that were the proper accessibility date, then Intersteel would not be entitled to any disgorgement of profits nor exemplary damages, and the red brief did not contest that. Right, so when I say February now, I'm going to mean February 28th, unless I hear differently from the other side. Suppose we agreed with you on that, that we agreed with the district court that 26 months is the right period that we'd call the Head Start period, which is just a period for cleansing the wrong from its effects, and so we now have an April 28th, 2007 ending period for activities that could be sales. Assume also that some or all of the iPod sales that were a result of the November 2006 competition, I know sometimes it's called the design win, but I'm not sure that matters, are corrupted sales, the result of a wrong. What is left to be, is there anything left to be decided on remand, putting aside exemplary damages and prejudgment interest in the 30 seats? I would of course like the chance to contest some of those assumptions. I think the other side has forfeited any request for damages based on a proper accessibility date of February 2005, because we said that they would have no entitlement to disgorgement of profits or exemplary damages if the court agreed with us on that proper accessibility date. Could you just answer Judge Tronta's question? Sorry. Does anything need to be backed out of that $8.5 million number if, you know, the iPhone 3G is out and the iPod touches in? Yes, because I think there would still be substantial amounts of sales that would be beyond, even taking all of Judge Tronta's assumptions, beyond the 26 months from February 2005. The record does have kind of at least broken out by year. I'm not sure if it's broken out by month. Are they all iPod touch sales? Part of my assumption was I was going to treat all the sales made as a result of the November 2006 design competition on the iPod touch would be properly recovered for trade secret disgorgement. That was the assumption. I think the record does have details breaking out the sales of iPod touch versus the iPhone 3G to the extent that, if I'm understanding the question, those can be separated out in the record that already exists. I'm not sure I answered your question. I guess I'm still uncertain whether on my assumptions a remand is needed for a calculation, because currently there's no iPhone 3G in the misappropriation award. The iPod touch is in the award. Is something else in the award that would have to be removed on the assumption that April 2007 is the end of the Head Start period? Let me make sure I'm understanding the court's hypothetical here. Is the hypothetical that all of the iPod sales, regardless of when they occurred, would be included in this disgorgement? All of them that were the result of the necessary predicate of the design approval in November 2006. And that might be all of them, even though I know a lot of those, I don't know, even though I'm assuming that some of those sales post-dated April 2007. I don't think I'm prepared. We'd be happy to submit something if the court would like. I don't think I'm prepared to address exactly that scenario, because the other side has never posited that scenario. Well, let me ask this. You ought to know. Your client was the one that was selling this ISL 29003. Were there any 03 sales after April 2007 unrelated to the iPhone 3G or the iPod touch? Like non-Apple customers, for example. Yes. There were 03 sales. That are part of the $8.5 million disgorgement award. No. My understanding is the $8.5 million disgorgement award is only for sales to Apple. Well, I'm not sure, Judge Chen. Again, this has not been the way that this case has been litigated or presented at the district court or on appeal. If I can just sort of take some of the assumptions in the court's hypothetical. One, I don't think there's any basis for a 26-month head start period here. The facts are that when Intersteel made the change to its photo dial in August of 2004, seven months later, in March of 2005, it had products in customers' hands to be sampled. If you're going to be looking at... But not the 03. And there's certainly evidence that the 01 was an unsatisfactory product for competition. And the whole point of the head start... A phrase like head start is often more obscuring than clarifying. The question is, there's a wrong. The fundamental remedy principle everywhere in the law is get rid of all the effects of the wrong. It's just everywhere in the law. Whether it's here, it's disgorging, or whether it's a rightful place for the plaintiff with respect to losses. So the question is, were the sales that are included in this trade secret award... Now just talk about them as the iPod sales. The iPod sales. Were they... When would those have occurred had there not been a serious wrong of jumping the gun on the trade secret? So I understand and agree with that question. I think where I would disagree is with some of the facts. I think it's important because there are a variety of products here with very similar numbers. I think the evidence about the very bad photo dial that Intersteel supposedly put out, that was before. That was not the 29-001. That was the earlier product that did not include the trade secret here. And in fact, the 29-001 sold 7.5 million units. So this notion that it was somehow not sufficiently competitive... Customers were buying this product and buying it in the millions. So I don't think that there's any basis to conclude that it wasn't sufficiently competitive in this market. But even... Did you listen to the last Federal Circuit argument? Yes. Counsel said that it was a 22-month head start period. Is that right? Yes. So I think that 22-month, Judge Shen, that was not based on the 29-003. That 22 months was because in February 2004, that was when Intersteel first started to design the 29-001. And then 22 months later in December 2005 is when the 29-001 was released. There was some internal documentation saying it would be a 12- to 24-month period to develop and market this product. Is that right? It was a 12- to 24-month period to market all of the changes. So the 29-001 had many changes, and the record shows that the bulk of those changes, or at least the time for the bulk of those changes, was related to the digital circuitry that was added. So the 29-001 not only changed the photodiode structure, it also added analog to digital converters, it added to serial bus, and the emissions on Tauss' side showed that that circuitry is far more complex. But none of that circuitry is required to practice the trade secret. And the reason you know that is because Tauss itself had a version of the exact trade secret structure here, it's called the TSL2440, that was analog. It did not include any of these digital components. And so I don't think you can say that the head start from the trade secret itself is that entire period, when the bulk of the, and I can provide the court with the records, but the bulk of the changes or the time for making those changes was on non-trade secret features. Can I take you to the February 2005 to January 2006 question? I didn't see any argument by your side saying yes, definitely, in a counterfactual scenario where if your client had played fair and square and not misappropriated any trade secrets, they certainly would have begun reverse engineering as soon as the other side's product was commercially released in February 2005. I didn't see that kind of argument. Instead I saw an argument of when could have your clients developed and reverse engineered, which would be February 2005. And that got me thinking of the patent law obviousness question, where we ask at the time of invention what would have a skilled artisan have done, not what a skilled artisan could have done. And so I'm puzzled by why you have an argument about what you could have done when really for this counterfactual scenario, it seems to me we ought to be asking what would you have done, and I didn't really see you telling that story. I see I'm into my rebuttal time. So Judge Chen, I think the reason it's the could have inquiry, and I think Texas law is clear on this in the Lucas decision that it's the could have inquiry, is because trade secret protection extends only insofar as it provides some competitive advantage in the marketplace. And so when products are sold from which competitors can readily access that information, there no longer is any competitive advantage. And in the Lucas decision, that was the exact issue that was put to the Texas Supreme Court. The plaintiff there argued that because the defendant had obtained the information improperly from the plaintiff, it was irrelevant that they could have gone out and obtained it through public sources, and relied on the K&G oil, the same decision that the district court relied on here. And the Texas Supreme Court rejected that view for the reason I just said. Once that information is available through public sources, readily available to competitors, there's no competitive advantage, and so no trade secret protection continues. If 22 months was the right period, starting from February 28th, we're beyond the December 2006 design win for the iPod, right? I think the iPod design win was in September 2006. September? I see, okay. But I think a couple of points on those 22 months. First of all, the 22 months, that started before any misappropriation. That started in February. The design process here started in February of 2004. There was a change to the photodiode in August of 2004. And there's numerous witness submissions making clear that the change to just the photodiode itself would take about 30 months. So I don't think you can add the six months that were before, or if I did my math right, yes, the six months that were before, and move it all ahead. I think the other really critical point to understand here is, if you're going to include the design wins, then the end of the Head Start period is the point at which someone could be competing for design wins, not when they were actually selling the product. So I'm thinking about the September 2006 design win on the iPod. Was that a two-company competition and Apple selected you and not them? Is that how that worked? Or is it like one of these government contracts where the government says, two people are now available to be selected when we decide it's time to put in an order. Don't worry about the clock. I'm not sure who else was competing at that time, Judge Strano. I do know that the design wins here, it is in some sense like the government context in that a design win just simply means you're on the list of potential providers from which Apple was going to select products. But I think the problem with thinking about the design wins is if you define the Head Start period as when products started being sold, then you can't also look at design wins. That's mixing and matching because the design, for example, the 29003, the design win happened in September of 2006, but the 29003 wasn't launched until October. So they had a product that they were already sampling much earlier than that. And so if you're going to consider design wins, you also need to consider the end of the Head Start period as the point at which the InterSilk could have had products to compete in a design win process. And so that's why the seven months that we've explained in our brief is the proper end because that's from when the misappropriation occurred in August 2004. It was seven months until InterSilk could actually have products in competitors' hands and was competing for design wins. So I think you can't mix and match sort of the end of the Head Start period as based on when sales first occurred but somehow include the design wins. You have to pick one or the other. I do just, if I could briefly touch on the exemplary damages, I think even... Can you start by saying why that wasn't effectively forfeited last time? Last time you brought up the disgorgement award, the exemplary damages award, put aside the contract. And most of the brief was about the disgorgement was improper for a variety of reasons, but one of which is it was the wrong decision maker. And then you have a single page or two paragraphs going over two pages that said, the rule is if actual damages are vacated, then so must be exemplary damages. So first you characterize the trade secret disgorgement as actual damages. But you simply say that, so that has to be sent back. When you could and could have said and didn't say what you now say, which is if it's just disgorgement, the Texas statute precludes an exemplary damages award. Why is it not too late to say that now? So I think two reasons. One, any forfeiture was forfeited by the other side. We pressed this argument below to the district court on remand. The other side did not say it had not been preserved, and the district court passed on it. So it was pressed and passed on, and I think it's properly before this court now. But even aside from that, I think the premise that it could have been pressed at the first appeal, I think is not quite right because at the first trial, Towson did attempt to prove compensatory damages. They sought disgorgement and they sought a reasonable royalty. But you were making the argument to this court that this was not a lost type of disgorgement. It was a pure disgorgement, and that was, in fact, a necessary premise of your argument that it had to be sent to a different decision maker, not the jury, but the judge. So if you were right about that, then you have everything in front of you to say, and in that circumstance, there cannot be an exemplary damages award. So I understand your point, Judge Sharma. I think it was a different issue because they had also proved some compensatory damages as well. So then I think that the question then would have been whether, well, when they proved some compensatory damages, and then they also sought disgorgement, would Texas law allow exemplary damages? It was only at the second trial that they made no attempt to prove any compensatory damage. The compensatory damage at the first trial being that they sought a reasonable royalty on trade secrets. At the second trial, there was no attempt to prove any compensatory damages from trade secrets. So I think this was a new issue that arose on remand in any event, as I said before. I think they forfeited their forfeiture argument. The red brief was the first time that that was raised. I think you wanted to say something about the merits of exemplary damages. Yes, I would like to address the merits of exemplary damages. I think the Texas statute, this is Chapter 41 of the Texas statute, is expressed that there are no exemplary damages absent some compensatory damages. Both the Longview decision on one side and the Walmart decision that the other side makes clear that at least on this type of disgorgement, the type of disgorgement that this court recognized in the prior appeal where the disgorgement is not a proxy for some kind of actual losses to the plaintiff, those are not compensatory damages under Texas law. I would have thought you would have said exemplary damages would be capped at $200,000, which is what the alternative is under 41.008B2. Yes, so I think the Walmart decision speaks to that, Judge Chen, and makes clear that when there's been no proof of any compensatory damage at all, any injury that was caused by the harm that's being complained of, then there are no exemplary damages available. And I think that makes sense as a matter of- Well, they found that the civil penalties there were, in fact, exemplary damages. We can't get any exemplary damages on top of exemplary damages. Well, I think they concluded, I think the upshot of the conclusion there was that the plaintiffs got nothing. They didn't also get the exemplary damages. They got nothing because they never proved any actual damages in the case. And I think that makes sense from the purpose of exemplary damages, which is to deter intentionally harmful conduct. And so if you don't prove any actual harm from the conduct you're complaining of, there's nothing to deter. I'm confused about a small detail, but I want to make sure I get it right. So I'm looking at your brief from eight years ago, and it reports the verdict that you were coming up on appeal on as trade secret misappropriation, $48 million in change for disgorgement of Intel's profits for misappropriation of trade secrets and $10 million in exemplary. There's nothing there about any compensatory piece. Yeah, that's correct, Judge Shonron. I'm sorry if I suggested otherwise. All I meant was that at that trial they had attempted to prove- At the trial, but that wasn't part of the award that you were appealing. That's right. And so I think my point was just it presented a different question of whether somebody, when somebody proved compensatory, potentially proved compensatory damages but then elected something else, then would- Right, but when the jury said they hadn't proved compensatory on the trade secret, then we're perfectly in the situation that you find yourself in now, which is non-exemplary, pure disgorgement. Can there be exemplary? I'd have to look back, Judge Shonron. Do I have a minute just to at least address the double recovery issue on contracts? I think I would like to hear what you think should happen on prejudgment interest, and let me tell you how to see if I understand this right. This is all not on the trade secret because I don't think that actually raises an issue, but on the contract damages. So we have 10 years of reasonable royalty from 2004 to 2014. Is that what it is? That's correct. Okay, and a judgment in 2022. And it's not disputed that there's prejudgment interest owed from 2014 to 2022 on all of it because 2014 is the end of the sales for which a reasonable royalty was paid. There is a dispute, however, about sales between November 2008 and 2014, and your view is that those sales should have interest only from the date of the sale up to 2014, plus everything eight years later to 2022. And the alternative is interest for all those sales back to November 2008. Have I framed what the concrete dispute is on that? I think I might frame it slightly differently, Judge Toronto, in that the plaintiffs have the burden, if they want to seek prejudgment interest, to propose a method for calculating prejudgment interest that's consistent with Texas law, or I guess if we're talking about the contract, consistent with California law. California law in the contract. The contract is governed by California law. So I think we did not have a burden to come forward with some alternative method, and I think the problem is that the only method the other side proposed is clearly contrary to the law because it's incurring interest long before the sales for which they're requesting a recovery. Was that also the case, or not the case, in our lump-sum royalty case, Schwendemann, and its sites in an earlier case, maybe Comcast or something like that? Were any of those sales post-complaint, or were they all pre-complaint? Yeah, I'm not sure. Because if some of those were post-complaint, then that's precedent for the idea that just not to make this too darn complicated, a lump-sum award can be treated as a unit, all of which, and therefore all governed by the complaint starting date. Okay. Am I allowed to say at least one thing on the double recovery? I think this case has proceeded all along, and particularly through the liability phase, on the understanding that TALS's claim here is for trade secret misappropriation or a breach of contract. And that's because all of the facts here are about a single injury based on the same set of operative facts, which is that in June of 2004, the parties entered into a trust relationship, and in August of 2004, InterCell breached that by using information it received within that relationship. That's a single injury, and you're allowed a single recovery for that injury. But when you mix a disgorgement remedy with a reasonable royalty remedy, you're getting a recovery twice. I think maybe my friend on the other side will disagree, but I don't think anybody would suggest that they could have recovered disgorgement of all profits sold during the Head Start period, but also a trade secret reasonable royalty for sales after that period. I thought the whole point, and I think what Judge Vann said, is we're talking about different units sold, which as you know in patent law is very common, different sales. Some of them can be lost profit, and some of them can be reasonable royalty. There are no overlapping units. I think the point I was making, Judge Toronto, maybe was slightly differently. If they tried to obtain both of these remedies under their trade secret theory, that would clearly be improper, and the reason it would be improper is because the trade secret disgorgement is already trying to value their entire injury, and then the trade secret reasonable royalty would be adding to that. Calling it a contract reasonable royalty rather than a trade secret reasonable royalty doesn't change that conclusion because it's the same claim for the same legal injury. The problem is that the disgorgement is already trying to give them the entire value that they have any entitlement to, and then when you add in the contract award, you're recovering more than once. The problem with the product theory is that the other side is relying on patent cases. These are not patent claims. They do not have any exclusionary right. Each sale is not a new infringement of any right, and there's no statutory entitlement to reasonable royalties. I think for all of those reasons, there was no basis to get an award on both contract and trade secret. Thank you for the question, both of you. And you'll have your rebuttal time. Can you add 13 minutes? Add 13. Good morning, Your Honors. Chase Coburn on behalf of TALS, I'm joined by my co-counsel Michael McCabe and Mike Wilson. May it please the Court. Seven years ago, this Court found overwhelming evidence, in its words, of Intersil's misappropriation and no evidence of Intersil's independent design. At Intersil's request, the Court remanded for the District Court to decide in equity, and based on the facts of this case, the extent of any head start or competitive advantage that Intersil gained from the misappropriation. At Appendix 116, Paragraph 50, the District Court found, quote, based on the evidence, had Intersil not misappropriated TALS's trade secret, Intersil would not have developed an acceptable or competitive chip to show, sample, and market to Apple before March 2008, and therefore would not have achieved. The March 2008 date, that reflects not only this hypothetical world of a head start period, but it also reflects what actually happened in reality, right? In the sense that what was chosen by the District Court was a start date of when they actually did the reverse engineering, and then the duration of time was the actual duration of time it took for Intersil to develop the 03 product. Is that right? That's correct, Your Honor. So I guess what I'm trying to figure out is that seems kind of strange to basically peg this counterfactual world to what actually happened, and I'm not sure that's really what the exercise was supposed to be in terms of trying to develop what would have happened if Intersil had played fair and square and done this cleanly. Absolutely, Your Honor. So I just would note that that was one of the reasons that the District Court noted for the head start period, the actual time it took Intersil to get from misappropriation to a competitive product. I guess what I'm trying to – let me put a finer point on it. Why wouldn't the start date be February 2005? Because all circumstances show that Intersil was a very motivated player here to get into this market as quickly as possible, and so therefore, of course, when this was released to everyone and when anyone and everyone could reverse engineer it, they, too, would have tried to reverse engineer it at that time and then from that point forward, however long it took, maybe 26 months, to eventually develop a product that could properly compete with your product. So several reasons for that, Your Honor. First of all, it was undisputed that there was no one else. There were no other competitors. There was no one else that ever ascertained or had access to the trade secret. In the hypothetical world, it's still anybody. Anybody that could have done it. Well, Your Honor, we would dispute that. There was evidence from our expert that found the prior knowledge. Do we really think that Intersil would have sat on its hands for a year before they would have actually reverse engineered your product? Your Honor, we don't think that Intersil had the experience to derive the trade secret from a reverse engineering tree. That's a different question. Like how long would it have actually taken these people, even if they were rookies, to actually successfully reverse engineer it? The proper question, I think, is when would they have done it? And I still don't understand the theory that they would have waited as long as they actually did when they didn't even need to because they already possessed the trade secret. So, Your Honor, I just would note the district court did make a factual finding. I want to know why there's some rationale for that. That Intersil couldn't do it or that anybody couldn't do it? That Intersil would have sat on its hands for a year after your product was released before it would have commenced reverse engineering. I don't know that Intersil would have sat on its hands. It's that Intersil would not be able to identify the trade secret and recreate that structure in its own products during that time period. That's a factual finding. That's the duration. That's the 26-month duration. My question is a different question, but it seems like we're not getting anywhere. I'm not sure I understand your question, Your Honor. I apologize. So, I would note, just to get back to, I think, your original question, Your Honor, was, you know, why do we care about their actual timeline, their actual development timeline? I do think it's important to note that that was simply one of, I think, six reasons that the district court noted for the 26-month period. The district court also considered Towson's development timeline, four-year development timeline, and said, look, this is half of that, roughly half of that. The court also considered Intersil's internal documents. You mentioned one of them that mentioned the 12- to 24-month time to market advantage. The district court said that there was substantial evidence that the trade secret never became known to anyone else. You know, Towson was right back in this market and got Apple. On exemplary damages, you heard, after the issue got remanded, at any time in front of the judge below, did you argue that exemplary damage, the other side, Intersil, cannot challenge exemplary damages anymore? Absolutely, Your Honor. Absolutely. And I don't have that appendix page in front of me. I can get it to you, Your Honor. Pretty critical. Absolutely. The first time this came out, It's actually too light of a word. We absolutely contested that. Yes, Your Honor. We contested that they could challenge liability for punitive damages and make the Seventh Amendment argument and make the Chapter 41 argument. We absolutely contested that. We can provide that after our argument. But I think it's clear. Go ahead, Your Honor. Sorry. Okay. Did you cite it, perhaps, in your red brief? I don't know that we cited it in our red brief, Your Honor. It wasn't until the reply brief that I think it was said that we did not raise this below. But it may well be there, Your Honor. I'm happy to address exemplary damages, but I just want to note on the proper accessibility question I think Judge Taranto raised. The answer to your question about whether or not April 28, 2007 would make a difference, and I think the answer is no remand would be necessary if Your Honor were to find that the Head Start period ended in April 28, 2007, because that would cover the iPod design win, as I think you noted, in September 2006. However, I do think it's important to note that there really is no basis to challenge the District Court's factual finding that the product release did not reveal the trade secret. This is a factual finding that the District Court made on Appendix 99, Paragraph 29. The Court finds that the trade secret was not properly accessible. So, I mean, you're pushing on a door that's not terribly open. All that language says is it's not the kind of case where, basically, there was a spec sheet that was put out with the product, that you actually needed to take the thing to do a little bit of work, at least a little bit. And I think the language that you're quoting doesn't go beyond the not apparent on its face immediately or by description. And then the question is, well, if you need an electron microscope, there are several of them local, and that's what everybody does. And I don't see the District Court having made a finding that that was an unlikely or difficult or terribly time-consuming enterprise in this particular market context. I understand, Your Honor, and I think what I would point to is the District Court's description of Texas case law on those dealing with post-misappropriation access to the trade secret. There's a fundamental distinction there. A lot of the cases cited in the opening brief are dealing with pre-misappropriation access for something available on the market, and you can't be accused of misappropriation if it's already available. But once we're after misappropriation, Texas case law is a little different from everywhere else, but it does provide a lot of protection for trade secrets, even after they become available in a patent application. That's the case in Hyde and K&G Oil and some of the other cases we cited. Even if it's available through reverse engineering, the misappropriator does not necessarily get the benefit of that publication. That's what Texas case law says. So it's not in every case, but the court has discretion to not give the misappropriator the benefit of that public disclosure. So as I read a bunch of these cases, maybe all of them, I don't know, I didn't see anything that departed from this fundamental, essentially universal, put people back in the position they would have been in in the absence of a wrong principle in Texas law. You're not suggesting that Texas does something that departs from that principle? No, Your Honor. No, Your Honor. And I think that goes to what Texas law is trying to accomplish with this doctrine. It's saying, let's look at the misappropriator. We don't care so much about everybody else. Let's look at what the misappropriator could have done absent misappropriation. Let's follow that. And in this case, we know that the record shows very clearly that they were far behind the competition. Taos was way ahead. There was a hundred-year collective gap of experience there. And when they took this information and adopted it. I'm sorry, I didn't get that. A hundred years? Over a hundred years. Collective experience between the two customers. Even if this instance wasn't going to have a hundred years ago, let alone the lawsuit. Between the engineers. Oh, adding experience. Yes, collective experience, Your Honor, yes. So there was a huge experience gap. They were way ahead. Their only product didn't even have the critical function that they needed to compete. All of that was gained through that due diligence in 2004. So when we look at intercills, the value to intercill, this is why Texas case law looks at the misappropriator. There's been adjudicated misappropriation. And decides what did they gain? What was the benefit to them? And that's consistent with what I think you're referring to, which is what the equity court has been doing for hundreds of years. Looking at what is the actual ill-gotten gain from the misappropriation. And that's exactly what the district court did. And I think that's why the district court could look at intercill. Even when there was evidence that, okay, people are putting these under scanning electron microscopes and looking at them and getting a picture. But that doesn't really answer the question of what intercill could do. And TALS's expert testified that without the prior knowledge that they gained during due diligence, this is appendix 11-533. Without this prior knowledge, reverse engineering wouldn't have done it for them. They would not have been able to obtain the trade secret and actually develop a competing product. There was evidence to that effect in the record. There's no evidence that the first of those couldn't be done by reverse engineering, right? The discovery of the structure. That's one thing. And then the make a competing product is a second thing. I don't remember seeing evidence that the discovery of the structure was particularly difficult or, yeah, that reverse engineering couldn't result in that discovery. It was true that you could obtain a picture of the structure, yes. But the evidence was that you wouldn't necessarily know why the structure was important, what to do with it, why this change was made between the 3-1 to a 1-1 unless you had the prior and the confidential information from due diligence. And I just would note that there is a distinction there. The confidential information that they gained was specific testing endpoints and results of using this technology. So you really already knew what to look for. You knew what it did before you go and pull the product apart. So they gained a lot of insight from that, and they knew what to look for. And Kirk Laney, TALS's CEO, said that reverse engineering would, in this context, would require knowing what to look for. And this is the witness that they cite repeatedly. Intersil itself said that this product was not that easily copied. When they were in due diligence with TALS, they were looking at TALS's products, they were talking to TALS's engineers, and they said, this is not that easily copied as we've been finding out. So they were way behind in the market. They got all this information. And then, even with all that information, it took them until January 2006 to actually reverse engineer it. So let me ask you a question. There's been discussion, assuming for the moment, that we go with the 2005 accessibility date, but also go with the 26-month period that the district court employed. Doesn't that create a problem for your cross-appeal? Because, as I read the record, this is for the claim for the $3 million on the cross-appeal. Doesn't that create a problem? Because we're talking here, I guess, about the 3G, ICON 3G, and it appears that all the activity related to that appeared or took place, if you will, prior to the end of 07. In particular, after April. That's correct, Your Honor. If the court were to adopt that framework, then it would exclude the cross-appeal. Okay, that's correct.  And just to be clear on this point that I think I started with, if we're dealing with an April 07 end of Head Start period, but also include the ICON because of the so-called design win back in September of 06, does anything change about the misappropriation award? Under the current judgment, no, Your Honor. Nothing would change because it would include the... And I'm excluding the exemplary, right? Just the non-exemplary recovery. Correct. Correct, Your Honor. That's right. If I had one other question. In the issue of the contract damages, as I understand in there, there was an award, among other things, we'll call the derivative products. Is that correct? That's correct, Your Honor. What exactly are the derivative products? So, the derivative products are products that incorporate the... Intersilver relied on this design, Talisman's design, to make the derivative products. The only real difference between the derivative products and the primary products is what the material is used to cover the diet. So, the primary products use metal and the derivative products use a color filter. That's really the only difference. Did the district court find that the derivative products incorporate the one-to-one interleaving pattern trade secret? I didn't see the district court suggest that at all. So, the district court didn't address that issue in particular because that's part of the jury question, whether the derivative products, first of all, used the trade secret for the confidential information, including the trade secret, and then also whether damages were properly awarded on the derivative products. The jury decided that issue and necessarily rejected the premise that the derivative products somehow didn't use the confidential information. And I would also note that... As I understood Judge Chen's question, it might be one thing whether the derivative products used confidential information. It might be a narrower question whether the derivative products used the one-to-one ratio that is the specific trade secret for purposes of the trade secret misappropriation, which I understand is not in front of the jury. What's the factual answer to whether the derivative products have the one-to-one ratio? So, I would just take the court to page 19 of our red brief. We have some pictures that we provide.   And I can't tell what those are. It's kind of difficult to see, Your Honor. The coloring may not work very well, but what can be seen from these pictures is a couple of things. The primary product, which is the top left, shows interleaved diodes right next to each other. Individual diodes, diode by diode. We're not going to be able to figure it out here. I just wanted to note one thing, Your Honor, that might help with the picture. The only difference that you might be able to discern from these pictures is that the groups of diodes are covered for the derivatives. But they're still covered in a one-to-one ratio. Covered and uncovered. It's a one-to-one ratio. Why is it called a derivative product? Why isn't it just called, you know, trade secret incorporated product? I don't know the answer to that, Your Honor. I don't know why that name was used. I'm sorry, excuse me. Are you finished? I'm finished. Okay. Were you saying, Mr. Holman, that the derivative products incorporate both the one-to-one trade secret that's the subject of the misappropriation issue and also other confidential material that is covered, other confidential matters, if you will, that are covered by the agreement, the California agreement? Yes, Your Honor. Yes. So you're saying both elements are included in the derivative products? Yes, Your Honor. Yes. And I don't believe that's in dispute any longer. We've pointed out in the red brief that there's all this evidence of use of the confidential information, and I believe the reply brief's response is the use is not the issue. It's inclusion of these products in the royalty base. So I think the issue has changed. Used in the royalty base for the contract damages. For the contract damages. That's correct. That's correct. And just a further point on the evidence there, we have a picture of a document on red brief, page 20, where Intersil actually was viewing these products as having the same structure, the same structure. That was Intersil's own description. Can I ask you on exemplary damages, putting aside any question about forfeiture or too late, what is your argument that the Texas statute, the Chapter 41 statute, permits exemplary damages when the non-exemplary damages are pure non-proxy disgorgement? So our first position there, Your Honor, is that Chapter 41 is not a prerequisite for exemplary damages. It's the damages cap statute in Texas, punitive damages cap. So if Chapter 41 doesn't apply, then we were entitled to the $64 million that the jury awarded. So we think that that's incorrect. We think Chapter 41 does apply. Okay. So assume it applies. We think it applies because, essentially, it covers any damages that are not exemplary damages. That's what it covers. And that's what the Forte decision says. I believe this was discussed in their argument. But Intersil's not arguing that disgorgement is exemplary damages. They're just saying it's not compensatory. The section of Chapter 41 I'm referring to is Chapter 41.0018, and it defines compensatory as essentially anything that's not exemplary damages. Is that what the chapter defines? I mean, right here, 41.008, your exemplary damages are not going to exceed two times the amount of economic damages plus any non-economic damages. But then the chapter itself defines economic damages, right? It means compensatory damages intended to compensate a claimant for actual economic or pecuniary loss. And I think we already wrapped up the last time in our prior opinion that this disgorgement award does not reflect at all the claimant's actual economic or pecuniary loss. So I don't see, I mean, may not exceed the greater of two times the amount of economic damages. There are no economic damages here. Not under the Texas Supreme Court's interpretation of Chapter 41, Your Honor. Are you talking about Wal-Mart versus Forte? The Wal-Mart decision, Your Honor. The Wal-Mart decision says that the long view, long view is the case that says disgorgement is not compensatory. It actually says it's not damages. It says it is compensatory, but it says it's not damages. I thought it also said not compensatory. No, it says it's just like attorney's fees and costs and I think some third thing. It is compensatory, but it's not damages. I don't remember anywhere in Wal-Mart versus Forte where it said something like a disgorgement award is the same thing as economic damages. Forte simply rejects the traditional view of disgorgement as non-compensatory relief or non-damages relief. In the sense that in 008A, in an action in which a claimant seeks recovery of damages, and it had to figure out whether that term damages encompasses something like the civil penalties that were being sought under the Texas Optometry Act. And civil penalties, it concluded, traditionally is not considered quote-unquote damages. But for purposes of Chapter 41, it concluded that yes, it is. Because it wanted to fulfill what it saw as the objective of Chapter 41, which was, it appears pretty strongly in the Texas Supreme Court's view, was to channel all exemplary damage recoveries through Chapter 41, which is why it concluded that Chapter 41 applies to such a thing as civil penalties. It's not damages, but it said so anyway. And then worked its way through the statute to conclude that in that particular case, there wasn't going to be any exemplary damages. And so now I'm trying to figure out why wouldn't, number one, an award for disgorgement be channeled through Chapter 41, given that understanding of the term damages by the Texas Supreme Court. And then finally, why can we ever regard this equitable award as economic damages? So on the first question, Your Honor, the reason that the civil penalties in Forte were not recoverable with exemplary damages is because the civil penalties were exemplary damages. That's what the Texas Supreme Court said. And answer to question two. But you have to answer for their answer to question one. And I'm sorry, Your Honor. There were two certified questions in that case, from the Fifth Circuit to the Texas Supreme Court. The first question was, does Chapter 41 even apply? Right. Or is it possible that it doesn't control the question of exemplary damages? And in that case, the Supreme Court said no. Yes, it does. Even though Chapter 41 says its application is for an action for recovery of damages, it concluded that an action for civil penalties is encompassed by this term, an action for damages. Right. And so, if that's true, then why wouldn't Chapter 41 also encompass an action for other kinds of monetary relief that are not pure traditional damages like the one we've got here? We would agree that it does, Your Honor. It does encompass. Then the next question is, why do you get two times the amount of your award here when your award cannot be said to be economic damages because your award does not at all reflect any pecuniary loss by your client? For several reasons, Your Honor. First, we don't think the Texas Supreme Court is reading that to say it has to be purely compensatory actual damages. I think it's reading that in the context of when it's citing Longview and distinguishing Longview and saying that's not a proper interpretation or description of damages for purposes of Chapter 41. It's looking at monetary relief. Is it your view that Forte, they've made a ruling about what does it mean to count as economic damages? I mean, there's two different terms here that I'm afraid we're mixing up. One is when Chapter 41 refers to damages. Then there's the more specific question under 41.008B1A where it talks about economic damages. That's a different animal than just damages. I agree with you, Your Honor, and I think what they ultimately say on that second question is, is it exemplary damages or is it something else? Essentially, any damages that's not exemplary damages would be covered by Chapter 41, but if it's exemplary damages, then you can't also recover more exemplary damages. But Intersil's not arguing that disgorgement is exemplary damages. So we don't have that question before the court. The question is simply whether disgorgement falls in one of the other boxes other than exemplary damages. If it doesn't, then it doesn't apply at all, and we get all the damages, the punitive damages. We suggest that it does apply. It's consistent with 150 years of Texas common law. There's been no Texas decision to suggest that Chapter 41 aggregated the common law of Texas that you can recover disgorgement with exemplary damages. Can we get to pre-judgment interest? Absolutely. Is it your view that you were entitled to the $8.5 million trade secret award at the time of filing the complaint? Your Honor, are you talking about the contract pre-judgment interest? Well, I guess we can first start with the contract pre-judgment interest. There were no sales yet, right, at the time of filing the complaint. That's correct, Your Honor. So isn't the whole theory behind pre-judgment interest compensatory to try to make the plaintiff whole? Not just compensatory, Your Honor, at least for purposes of the Texas law. I know we're talking about a contract, but the Texas statute says that it also encourages settlement and deters delay by the defendant in particular. We cite this in the red brief. But as for the California statute, and we're talking about a reasonable royalty here, this is lost royalty that would have occurred. Right, it's an ongoing royalty, right? It wasn't some kind of lump sum royalty. Well, these were lost royalties that would have been agreed upon before these sales occurred. So in terms of looking at what the actual loss is, we're looking before the sales. We're looking at what the parties would have agreed to. I mean, just like in a patent case, we're looking at hypothetical royalties. There's no loss until there's sales. What the agreement is, is if there are going to be sales in the next 10 years, then this is what you must pay. But if there are no sales, it's going to be zero. That's correct. So prejudgment interest is just delay in getting the money from where you would have gotten it, right? So how does that go back to the date of the complaint for sales that didn't occur until afterwards? I think for the same reasons that it does in a patent case. We were looking at the time of the hypothetical negotiation. We're looking at when the parties would have agreed. We're also looking at discretionary factors under California law that they're not contesting. The district court had discretion to set the date of prejudgment interest. Would it be difficult to do the calculation? First of all, you may remember my little description of how there's no dispute about 2014 to 2022. So all of that is not concretely in dispute. So there's like six years worth of sales from 2008 date of complaint until 2014. Would it be difficult to do the calculation? Do you know the dates of all the sales? I don't, Your Honor. I don't know whether you know them standing right here. Well, frankly, I don't know that they're in the record. I mean, we have aggregate numbers of sales for each product. I don't know that it would be possible to go back and, you know, run the numbers on every single sale and how long it was until, you know, from the date of sale. So I don't know that that's in the record, but that's one of the reasons that... Is it your burden to get prejudgment interest? It's our burden to satisfy the discretionary factors that the court under California law has to consider. The court did consider those factors, has an entire analysis of these factors. They don't challenge that on appeal. They're just challenging the district court's ultimate conclusion to set the date at the date of suit. And this is not something that is outside of the ordinary for courts to decide based on the California statute. And the defendant made that objection to the district court? Is that right? That's correct. Okay. That's correct. Briefly, if I could just address the contract really quickly. Very quickly. Yes. So the contract overlap issue, I just want to note that this court held in the mandate and applied the ARRA decision based on separate operative facts. Separate operative facts being separate sales of separate accused products. The district court faithfully applied that on remand and held that 18 distinct accused products were separate and distinct from the single accused product used in the trade secret award. So we don't believe there's any basis to claim now that there's duplicative damages, especially when Intersil has relied on the ARRA decision. We've all relied on the ARRA decision. We've considered it analogous to Texas law. The district court considered it that way. I don't believe that's disputed. If that is the standard, there is no overlap here whatsoever. And I would also note that the actual facts... I don't think you need to... You're not saying anything that's perfectly self-evident from your brief. So there's no reason to just repeat that.  Okay. If the court doesn't have any further questions, I would just ask, the court respectfully requests that the court affirm all the awards, modify the judgment to include the ample design lines, and remand for no further issues. Thank you, Your Honor. Thank you. Just a couple points, and I'll try not to take up all of the time. On the difference between the 29-001 and the 003, which I take it is the basis for the notion that the 001 was not realistically competing, the change there was the change to the shape of the photodiode. Originally, there was kind of a square block shape, and the change was to make the photodiode narrow and closer together. But that's not the trade secret that this court recognized in the prior appeal, and for good reason, because that's shown on the face of House's patent. I think to make sure I get the patent number, but the 918, 981, the patent that was in this case before shows exactly these narrow, long, and also describes exactly the basis for the spacing and things like that. So the change there was not a change based on the protected trade secret here. So it's improper to give interstitial value from things that were already publicly disclosed. And I think the other point to make is, in fact, looking at the pictures in the red brief on page 19 of these derivative products, interstitial continues to use that same photodiode structure, the large blocks that were on the 29001. After this time, it continued to sell products that have that large structure. And so I don't think there's any basis in this record for concluding that the 003 somehow was a better competitive product than the 001 simply because interstitial succeeded in obtaining a design win from Apple on that product. One other point. Would you agree that on these two separate points, when did the secret enter the public domain and what would your client have done in a competitive way once that secret was available? The first, your argument is essentially this court asked the wrong question and the law means it's February 28th, 2005. But the second is a consider all of the facts and hence fact finding by the district court, which you have to conclude. You have to say at this point would be clear error. Right. So that's the right standard for that component. That's the right standard for the factual components of the district court's finding. But I think the problem was that the district court committed legal errors, Judge Toronto, because it considered things that are not properly part of the inquiry. It considered the time to develop the trade secret itself from scratch without proper access. That's why it was considering the four years it took Taos to develop the trade secret. But the proper accessibility means that Taos or interstitial already possessed the trade secret without having to develop it. It also included time to develop all this digital circuitry. And the record is full of admissions from Taos' witnesses that the digital circuitry, which is not protected and is not part of the trade secret, is the far more complex part of changes to the product. And then I think third, it included not just the first generation of products, but the second generation. I don't think Texas law permits that inquiry. The case the district court relied on for that was the research equipment case. But in the research equipment case, it was undisputed that it took eight months before the misappropriator's competition came home. Yet the Texas court there rejected the trade secret holder's request for an eight-month injunction or for a longer injunction and said that a 90-day injunction was proper because of the simplicity of the product. And that's the only competitive advantage was the 90 days. Here, the photodiode itself, Taos' own CEO at the time admitted, the photodiode itself is a very simple part. And there's multiple, we cite in our brief, multiple admissions that for that part only, it took 30 days. And in fact, just to put this in context, this isn't just me telling you what's in the record. If you look at when the reverse engineering happened in January 2006, Judge Chen, you talked about what actually happened. In January 2006, InterCell reverse engineered and took photos and saw they're using the narrower strip. One month later, in February, it said, let's switch our product, the 003, to that design. By April and May of that same year, so three to four months later, it had product in Apple's hands to be sampling with that exact structure. So I think that shows you in terms of what actually happened. Within three to four months of reverse engineering, it had changed its photodiode to include that structure and had product in customers' hands. I think on those facts, I think there are legal errors, but even as a matter of factual error, I think it is clear error to adopt the 26-month head start period. Just briefly on the derivative products. They were called derivative products because they do not, the parties agreed, they do not include the trade secret. That's for at least two reasons. I think the simplest and easiest reason that they do not include the trade secret is because they do not use the shielded and unshielded wells. Instead, the derivative products use color filters, which this court's prior decision recognized that was the old technology that Taos supposedly overcame by instead of using color filters, using shielded and unshielded wells. And so these are derivative products because they're using color filters. And then also, they do not, for the most part, do not use one-to-one in the way that there's one-to-one interleaving. What Taos is calling one-to-one is actually a 16-to-16 or different ratios where there are big blocks of photodiodes, say eight at one time, and then big blocks of photodiodes. And Taos is trying to say that's one-to-one. But for either of those reasons, they do not. So you're saying the derivative products are totally divorced from the trade secret product? Well, I don't want to overstate it, Judge Schall. They do not include the trade secret structure, which Taos's own CEO admitted was 99.5% of the value proposition here and would have been the entire basis of a reasonable royalty negotiation. And so they do not include that structure. And in fact, for the reasons I had just explained, they largely include the design that Taos said it was overcoming because they used the color filters that were part of the prior art before. I guess I am using almost all of my time. Can we get to the exemplary damages again? There was a question in response to Judge Tronco's question about whether the arguable waiver is a challenge to the exemplary damage award. You said, well, the other side waives any possible waiver by not raising that waiver problem below post-reman. And I'm just wondering, you said that 35 minutes ago. Did you say it anywhere in your briefing? No, so we didn't say that in the briefing. So I guess what I'm wondering is, are we looking at a triple waiver? A waiver of the waiver of the waiver. I think the answer is no, because the red brief, I think we would have waived it if it was presented and we didn't raise it in our blue brief, Judge Chen. But I don't know that there's a waiver in a reply brief. They brought up in their red brief that you waived it. And now it's time to look at the yellow brief in response to that allegation of waiver. And I don't see this yellow brief saying anything about, aha, there's a waiver of the waiver against our potential waiver. It was here today. It is not in our yellow brief, Judge Chen. I guess I'm not usually familiar with waivers in a reply brief, but it is not there. I will just say that we agree with your reading of Walmart and the way it applies to the facts of the case. Thank you. Thanks to our counsel. The case is submitted.